IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

MONTARIO NEVILLE,                          )
     Plaintiff,                            )
                         )     Civil Action No. 7:22-cv-00242
v.                                         )
                         )     By: Elizabeth K. Dillon
BALLAD HEALTH SYSTEM, INC., *et al.*, )         United States District Judge
     Defendants.                           )

## MEMORANDUM OPINION

Plaintiff Montario Neville, a Virginia prisoner proceeding *pro se*, filed this civil rights

action pursuant to 42 U.S.C. § 1983, asserting claims arising from his incarceration at Red Onion

State Prison ("Red Onion").  (Dkt. No. 1.)  The complaint is before the court for review pursuant

to 28 U.S.C. § 1915A and 42 U.S.C. § 1997e.  For the reasons discussed herein, the court

concludes that Neville's allegations fail to state a claim against the named defendants, and the

complaint must be dismissed.  The court will dismiss the complaint without prejudice, however,

and allow Neville the opportunity to file an amended complaint.

### I.    BACKGROUND

**A.  Allegations in Complaint**

Plaintiff's complaint names thirteen defendants.  Eight of these he identifies as being

correctional or medical staff at Red Onion:  Rick White (Warden), S. Fuller (Assistant Warden),

J. Hill (Sergeant), Still (Captain), Dwayne A. Turner (Chief of Housing and Programs), Eric A.

Miller (Unit Manager), Leah Jessee (Nurse Practitioner), and J. Bledsoe (Registered Nurse).  He

also names two medical personnel from Blue Ridge Orthopedics and Sport Medicine in

Abingdon, Virginia (Dr. Jonathan Clark and Physician Assistant Christy G. McGhee), Dr. Fox

(for whom he gives an address of Richmond), "Gregory Holloway," who he identifies as

"Western Region Administration" in Roanoke, and "Ballad Health Inc.," for whom he does not

provide an address.  Based on documents attached to Neville's complaint, it appears that he received several x-rays and other diagnostic tests at a Ballad Health facility in Abingdon.

Neville alleges that, on September 28, 2021, he injured his right knee while playing football at Red Onion.  He was taken to the medical department and initially seen by a nurse practitioner, Leah Jessee.  She prescribed Tylenol and Motrin, gave him an ace wrap with ice, and kept him overnight in medical.  In the morning, Jessee released Neville back to his prior housing.  Hours later, he was brought back to medical for an x-ray, which revealed that his right knee was broken.  Jessee told Neville that she would be keeping him in medical until the knee healed.  (Compl. 2–3.)

He was assigned to Medical Cell 5 and given a walker to use.  Neville states that the cell was small and "not made for a walker."  He said that he "made this known to medical staff."  He also advised "medical staff"—who he does not name except for Jessee—that he could not see the television unless standing at the door or sitting on his toilet.  He asked Jessee to be moved to a different cell so that he could use his walker and not have to stand at the door to watch television, but apparently that did not happen.  He alleges that he had to "suffer through sleepless nights" because of the pain in his knee and his leg "locking up on him."  At some point, he complained in writing to some unspecified person about his pain and the fact that the medications were not helping his pain.  (*Id.* at 3.)

Neville remained in a medical cell for more than three months.  On January 20, 2022, Neville was cleared to return to population with a bottom bunk pass.  Unit Manager Miller told him he would be moving to B-114, but instead he was moved to B-109 and assigned to the top bunk.  Neville says that he "made known" that he had a bottom bunk pass and should not be on a top bunk, although he again fails to say who he told that or when.  (*Id.* at 3–4.)

On January 24, 2022, while trying to get on the top bunk, Neville's "leg gave out one pop while [he] was falling to the floor off the 2nd step." He says he then tried for two hours to get medical help. He was sent back to medical, placed in Medical Cell 6, and given a walker.

He complains that he has spent over six months in a medical cell "without having any meaningful or proper equal medical treatment" for his knee, even after a new CT scan showed a new break and demineralization of the bone. He states that he has complained about his knee popping and having pain and not being able to sleep. He further alleges that he was told by a "nurse practitioner," that he cannot have an MRI done because of the cost, and that this was "confirmed" by nurse J. Bledsoe.[1]  (*Id.* at 4.)

He also complains about the conditions of his medical cell, stating that he has had no access to outside recreation or fresh air for six months and that this has caused him mental harm "on top of his fear of losing his leg." (*Id.*) He describes in detail the psychological harm he has suffered as a result. (*Id.* at 5.)

After setting forth those facts, Neville conclusorily states that six of the defendants (defendants Ballad Health, Jonathan Clark, Christy G. McGhee, Leah Jessee, Dr. Fox, and J. Bledsoe), all of whom are medical personnel, "failed to take corrective actions concerning" his allegations. (*Id.*) He also claims that five other defendants (Dwayne A. Turner, Eric A. Miller, J. Hill, Rick White, and S. Fuller) "failed to protect" his health and safety when he was moved from the medical unit to a general population cell and assigned a top bunk despite his medical bottom bunk assignment, resulting in his second knee injury.[2]  (*Id.* at 6.)

---

[1] Medical records attached to the complaint reflect that he could not have an MRI because there was a bullet lodged in his rib. (Dkt. No. 1-1, at 33.) He alleges that he was told that the "cost of having the bullet removed" to have one MRI done would be more than the Virginia Department of Corrections ("VDOC") would spend. (Compl. 4.)

[2] Neville does not refer to defendants Still or Holloway except in his list of defendants and the list of amounts he seeks against each. (*See generally* Compl.)

**B. Medical Records**

Neville attached to his complaint almost one hundred pages of medical records and grievance documents, which the court also has considered.  The records reflect that his right knee was x-rayed on September 29, 2021, the day after the injury.  The radiologist's impression said, "Suspect subtle nondisplaced longitudinal fracture of tibial plateau.  CT or MRI would provide more definitive evaluation if clinical findings are equivocal."  (Dkt. No. 1-1, at 1.)  The records also reflect repeated visits with Blue Ridge Orthopedics & Sports Medicine ("BROSM") in Abingdon.  For example, he was first evaluated on October 5, 2021, at which point a CT scan was recommended.  Neville was placed in a make-shift posterior knee splint, and he was ordered to avoid any weight-bearing on his right leg.  On October 6, 2021, consistent with BROSM's recommendation, Jessee authorized a CT scan of Neville's right knee, and that test was administered at the radiology department of Ballad Health System on October 12, 2021.  The impression from that test was as follows:

1. There are mildly displaced intra-articular fractures involving the anterior margins of the medial and lateral tibial plateaus.
2. A punctate calcified fragment off the medial margin of the trochlea is indeterminate, possibly a small chip fracture or loose body.
3. There is a gap in the expected location of the midsubstance of the ACL, suspicious for a tear.

(Dkt. No. 1-1, at 18–19.)

Thereafter, Neville had repeated follow-up visits at BROSM.  At a November 16, 2021 appointment, the physician recommended physical therapy, ordered that Neville continue on non-weightbearing for 2 additional weeks (until he was about 8 weeks post-injury), and stated that Neville would then be given instructions on progressive weight-bearing.  Another x-ray was also done at that time.  (*Id.* at 21–24.)

He was seen again at BROSM on December 15, 2021, at which time he was cleared to progress to weight-bearing.  The provider, McGhee, also "again recommend[ed] physical therapy

4

for quad strengthening so he is more stable on the right leg.  He will return in 6 weeks for final evaluation."  It appears that an x-ray also was done at that time.  (*Id.* at 26–29.)  The medical records also reflect numerous physical therapy visits, from November 2021 through at least the end of February 2022.  (*Id.* at 62–78.)

Neville returned to BROSM again on January 27, 2022, and he mentioned his re-injury while trying to access the top bunk.  In notes from the visit, the physician assistant states that she is evaluating the knee for a meniscal tear.  An x-ray was done, and the treatment notes also state that she "would have ordered an MRI however the patient has a retained bullet fragment in his side and is unable to undergo MRI.  Another CT was recommended and, if it confirmed a meniscal tear, his care would be transferred to an orthopedic surgeon."  (*Id.* at 33.)

Neville then had another CT scan on March 2, 2022.  The radiologist's impression stated:

> Subtle findings potentially representing nondisplaced nondepressed fracture of the anterior aspect of the medial tibial plateau.  Bones are, however, diffusely demineralized decreasing sensitivity for nondisplaced fractures.  MRI is recommended for further characterization.

(*Id.* at 37.)

His Red Onion treatment notes reflect that Neville met with a provider on March 7, 2022, to follow-up on knee pain, to discuss the CT scan results, and to discuss a treatment plan.  The notes show that the provider told Neville why "we cannot proceed with an MRI.  But explained I am referring him to a knee surgeon to assess for possible surgery or further treatment.  He verbalized understanding."  (*Id.* at 42; *see also id.* (entry the same day referencing conversation with unnamed physician about the MRI, the need to visualize the bullet via x-ray, and the fact that an MRI may be possible depending on location and type of bullet).)  The medical records Neville provided only include records for about another two weeks after March 7.  Those records refer to regular monitoring of Neville, to an approval of an extra pillow, and to attempts to

manage his pain with medication.  They do not reflect that he was seen by any other outside

providers in those few weeks.  Neville then filed his lawsuit on or around May 2, 2022.

II.   DISCUSSION

**A.  28 U.S.C. § 1915A(a)  and 42 U.S.C. § 1997e(c)**

Under 28 U.S.C. § 1915A(a), the court must conduct an initial review of a "complaint in

a civil action in which a prisoner seeks redress from a governmental entity or officer or employee

of a governmental entity," and the court should dismiss any portion of it that fails to state a claim

or is frivolous, 28 U.S.C. § 1915A(b)(1).  The court also has an obligation to review and dismiss

"any action brought with respect to prison conditions" under § 1983, if it fails to state a claim,

among other reasons.  42 U.S.C. § 1997e(c); *see also* 28 U.S.C. § 1915(e)(2)(B) (requiring court,

in a case where a plaintiff is proceeding *in forma pauperis*, to dismiss the case if it is frivolous or

fails to state a claim on which relief may be granted).  Pleadings of self-represented litigants are

given a liberal construction and held to a less stringent standard than formal pleadings drafted by

lawyers.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).  Liberal construction does not

mean, however, that the court can ignore a clear failure in pleadings to allege facts setting forth a

claim cognizable in a federal district court.  *See Weller v. Dep't of Social Servs.*, 901 F.2d 387,

391 (4th Cir. 1990).

**B.  Neville's Claims**

Neville brings his claims pursuant to 42 U.S.C. § 1983.  "[T]o state a claim under

§ 1983[,] a plaintiff must allege the violation of a right secured by the Constitution and laws of

the United States, and must show that the alleged deprivation was committed by a person acting

under color of state law."  *Loftus v. Bobzien*, 848 F.3d 278, 284–85 (4th Cir. 2017) (internal

quotation marks omitted).

Neville's first claim is an Eighth Amendment claim against all defendants.  It is based on the conditions in his medical cell, which he alleges involved prolonged confinement without normal human contact, physical exercise, outside recreation, or other meaningful activity, and resulted in psychological and physical injury.  (*Id.* at 6–7.)  Construing his complaint liberally, he is also asserting a conditions-of-confinement claim based on allegations that defendants were deliberately indifferent to his need for a bottom bunk, instead housing him in a cell where he was assigned a top bunk.  He summarily states that "defendants have been aware of all of the deprivations complained of" and have either condoned or been deliberately indifferent toward the deprivations.  He further states that they have been aware of his complaints through grievances and written complaints.  (*Id.* at 8.)

Neville's second claim is one he characterizes as due process claim pursuant to the Fourteenth Amendment.  In it, he states that he has been deprived of a liberty interest without due process because he was denied meaningful and timely medical treatment and instead held under the conditions about which he complains in his first claim.  (*Id.* at 9.)  Although Neville refers to this claim as a "due process" violation under the Fourteenth Amendment, it is properly construed and analyzed as an Eighth Amendment claim of deliberate indifference to his medical needs.

For relief, Neville asks for all defendants to be terminated because of the "lack of leadership," a declaratory judgment that his rights have been violated, and compensatory and punitive damages, in varying amounts.  (*Id.* at 10–11.)

### 1.  Eighth Amendment Conditions-of-Confinement Claims

As noted, Neville's first claim is actually two distinct conditions-of-confinement claims. His first is a challenge to the conditions of his months-long stay in the medical cell, which included a lack of outside recreation opportunities and lack of human contact while housed there.

Second, he challenges his assignment to the top bunk of a cell for several days in January 2022, despite his bottom bunk pass. He alleges that the failure to follow or honor the bottom bunk pass resulted in additional injury to his knee.

The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To plead such a claim, a prisoner must set forth facts showing that: (1) objectively, the deprivation was sufficiently serious, in that the challenged, official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). To satisfy the first element, the prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). To satisfy the second, the prisoner must show that a defendant was *actually* aware of a serious risk of significant harm to the prisoner and disregarded it. *Id.* This is an "exacting standard." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

Importantly, moreover, liability under § 1983 is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). Thus, a § 1983 claim requires factual detail about each defendant's personal involvement. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (explaining that liability will lie under § 1983 only "where it is affirmatively shown that the official charged acted personally" in the violation of plaintiff's rights and affirming dismissal of claim where plaintiff did not allege personal involvement by defendant) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)).

Neville fails to include any factual allegations as to nearly all of the defendants. He describes specific actions by, or interactions with, only with three of the defendants—Nurse

Practitioner Leah Jessee, Nurse J. Bledsoe, and Eric A. Miller.  Neville's only allegations against the other defendants are that they exhibited a "lack of leadership," failed to protect him from being assigned a top bunk, and generally knew of the conditions of his confinement or his lack of medical treatment.[3]  But grouping together the defendants and then setting forth these general assertions, rather than factual allegations, is insufficient to state an Eighth Amendment claim against them.  Put differently, he has failed to allege any facts to show that any of them were personally aware of a risk of harm to him and disregarded it, as he must.  *Shakka*, 71 F.3d at 166.

Instead, it appears that Neville is attempting to hold most of these individual liable simply because of their positions within Red Onion or within VDOC.  To the extent that Neville is proceeding on a theory of supervisory liability, he can plead such liability by alleging facts sufficient to show (1) that the defendant "had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) that the defendant's "response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'"; and (3) that there was an "affirmative causal link" between the defendant's conduct and plaintiff's "particular constitutional injury." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

The facts alleged by Neville do not plausibly allege those three elements.  Among other failures, he fails to allege or present any specific facts that any of these persons had actual knowledge of the facts underlying his claims or of any constitutional violations by staff, or constructive knowledge based on such occurrences being widespread.  Nor has he alleged any causal link between any defendant's conduct and his alleged "particular constitutional injury."

---

[3] Lumping all defendants together, Neville states that they "have been aware of all of the deprivations" and have "condoned or been deliberately indifferent to them," but he does not explain how any particular defendant was made aware of any of the facts alleged, with the exception of Jessee and, to a lesser degree, Miller.

*Cf. Wilkins*, 751 F.3d at 226.  Thus, any supervisory liability claim against them fails.

Turning to the only three defendants with specific allegations against them—Jessee, Bledsoe, and Miller—the court concludes that Neville also has failed to state a claim against them.  First, as to Bledsoe, the only allegations against her is that she "confirmed" Neville could not have an MRI because of cost.  This is part of his medical claim and discussed in Section II-B-2 *infra.*

Second, as to Miller, Neville alleges only that, when Neville was to return to general population with a lower bunk pass, Miller told him he would be moving to cell B-114.  Instead, though, Neville was assigned to cell B-109 and placed on the top bunk.  Critically, Neville does not allege that Miller knew he had a lower bunk pass, or that Miller knew he was assigned to a different cell or was assigned to the top bunk.  He also does not allege that it was Miller who made the decision as to his cell placement.  He does not even allege that the failure to assign him a bottom bunk was intentional, rather than negligent, by whoever made that decision.  *See Daniels v. Williams,* 474 U.S. 327, 335–36 (1986) (explaining that individuals do not have a constitutional right to be free from a government employee's negligence, even if it causes an injury).  Effectively, Neville alleges that Miller told him he would be housed in one cell, but Neville ended up housed in another.  Those facts do not allege deliberate indifference on the part of Miller.

Turning to Jessee, the medical claim against her is discussed separately in Section II-B-2 *infra*.  As to any conditions-of-confinement claim, Neville has plausibly alleged that Jessee knew, or even had some role, in determining that he should remain in medical while he was being treated and his knee was healing.  In particular, he complains that he asked Jessee to be moved to a different cell so he could use his walker and not have to stand at the door to see the television, but he was not moved.  This alone, however, is insufficient to state a claim for several

reasons.

First of all, despite Neville's assertion that his housing in a medical cell has caused him emotional harm, he has not alleged facts to show that he has suffered "significant physical or emotional harm, or a grave risk of such harm." *Cf. Shakka*, 71 F.3d at 166. Indeed, given his knee injury, the limitations it placed on his mobility, and the pain he alleges he was experiencing, it is difficult to see how keeping him in medical was more harmful than releasing him to the general population. The fact that he re-injured his knee when he was released further supports the decision to keep him in medical. Also, he was permitted to view a television, and his allegations of "no human contact" are belied by his medical records, which show that he was under frequent observation and, according to the medical charts, he interacted with nurses or other medical personnel multiple times a day.

In any event, even if his allegations were sufficient to satisfy the first element of his claim, he has not alleged facts to show that Jessee—or anyone else—was aware of a grave risk of harm to him and failed to act. Notably, he does not allege that he ever asked Jessee, or anyone, to be released back into the general population. He alleges that he complained about pain to Jessee, but not that he complained to her about any mental harm from being kept in medical for so long. In fact, although one of his attached grievance documents notes that he has "been in medical for over 6 months," the crux of his complaint was that he was not receiving what he believed was proper medical treatment. His grievance did not ask to be transferred from his medical cell or complain about any mental strain on him from the prolonged stay in medical. Instead, he asked to have his leg "fix[ed] with all the right treatment." (Dkt. No. 1-1, at 80.)

For all of these reasons, the conditions-of-confinement claims, at least as they are currently pled, fail to state a claim and must be dismissed.

### 2.  Eighth Amendment Claim Based on Medical Care

Neville's second claim is that defendants have failed to provide him the "proper" care for his knee injury.  To state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must allege facts sufficient to demonstrate that the defendant was deliberately indifferent to a serious medical need.  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Staples v. Va. Dep't of Corr.*, 904 F. Supp. 487, 492 (E.D. Va. 1995).  To establish deliberate indifference, a plaintiff must present facts to demonstrate that the defendant had actual knowledge of an objectively serious medical need and disregarded that need.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Rish v. Johnson*, 131 F.2d 1092, 1096 (4th Cir. 1997).

Importantly, however, a claim based only on a disagreement between an inmate and medical personnel regarding diagnosis or course of treatment does not implicate the Eighth Amendment.  *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Harris v. Murray*, 761 F. Supp. 409, 414 (E.D. Va. 1990).  Questions of medical judgment are not subject to judicial review.  *Russell*, 528 F.2d at 319 (citing *Shields v. Kunkel*, 442 F.2d 409 (9th Cir. 1971)).  Instead, the prison official's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.  *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

The court assumes, for purposes of this opinion, that Neville's knee injuries and the resultant pain constitute a "serious medical need" and plausibly satisfy the objective element of an Eighth Amendment claim.  *Cf. Nellon v. Hampton*, No. 1:15CV592, 2016 WL 6426382, at *3 (M.D.N.C. Oct. 31, 2016), *report and recommendation adopted,* No. 1:15CV592, 2016 WL

11373412 (M.D.N.C. Dec. 12, 2016) (collecting authority discussing whether a torn meniscus and torn ACL are a "serious medical need" under *Estelle*).

Neville has not put forth sufficient facts, however, to plausibly allege that any of the defendants was deliberately indifferent toward that serious medical need.  First of all, the medical records as a whole reflect that Neville has received ongoing treatment for his injury.  He received numerous x-rays, two CT scans, months of physical therapy, and he was seen by an outside orthopedics practice on at least four occasions, all of which occurred less than six months after he first injured his knee in late September 2021.  At different times, Neville was given devices to assist with recovery or pain, including a walker, a brace, a splint, and an extra pillow.  He also was prescribed pain medication (at least Tylenol and ibuprofen) throughout the period.  (*See* Dkt. No. 1-1, at 56 (indicating an October 5, 2021 order for a 6-month continuation of both medicines—800mg of ibuprofen twice daily, and 1000 mg of Tylenol twice daily).)

Near the end of that six-month window, on March 7, 2022, he was advised that he would be referred to a surgeon for evaluation, and there is a note in the chart directing that he be referred to an "ortho in Marion," although he apparently did not have that appointment before the date of the last medical record he submitted, which was March 23, 2022.[4]  (*Id.* at 42.)  He also was allowed to remain in a medical cell for observation for most of that period and was prescribed various medications for pain.  Although he challenges the conditions of his confinement in his medical cell and the length of time he was kept there, the medical treatment provided shows consistent, timely attention to his knee injury and at least conservative attempts at treatment.  It does not reflect conduct so "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *See Miltier*, 896 F.2d at 851.

---

[4]  He filed his lawsuit in early May, and he has not advised the court as to whether an appointment with the surgeon has been scheduled or has occurred.

13

Furthermore, he has not alleged that any *particular* defendant "had actual knowledge of an objectively serious medical need and disregarded that need," as he must to state a claim. *See Farmer,* 511 U.S. at 837. Instead, it appears that Neville simply sued many medical providers whose names were contained within his medical records, and he apparently is displeased with the treatment he has received and the results of that treatment. But he has not alleged facts sufficient to show that any of them had knowledge that their course of treatment posed a substantial risk of injury to him, and then deliberately ignored that risk.

Indeed, as to most of the providers he names as defendants, it is unclear what else he believes they should have done. Ballad Health, Inc.'s sole involvement is that it is the entity who performed some of his x-rays and his CT scans. He offers no allegations to show that anyone at Ballad Health, let alone the entity itself, knew of any risk to Neville and failed to act or take some affirmative step to mitigate that risk.

Likewise, as to Dr. Clark and PA McGhee, his providers at BROSM, he does not specify what more he believes either of them should have done. To the extent he is complaining that they should have referred him to a surgeon or performed an MRI, the medical records reflect that the providers were concerned about giving him an MRI because of the bullet lodged in his rib, and the BROSM records indicate that a referral to a surgeon might be warranted based on the results of the second CT scan. But Neville he does not allege that these outside providers had ever seen the results of his second CT scan or that they had any control over whether he would be referred to a surgeon. In short, he has not alleged that they knew of and disregarded a substantial risk of harm to him.

He alleges no actions or omissions by Dr. Fox at all, and so does not adequately allege that Dr. Fox was deliberately indifferent.

With regard to Jessee, a nurse practitioner at Red Onion, his allegations are not

particularly detailed, but he at least includes some.  First, he alleges that she saw him on the day

of his injury, prescribed Tylenol and an ace wrap with ice and kept him overnight.  After

releasing him, he was brought back for an x-ray and Jessee kept him in the medical unit until his

knee healed.  He does not appear to complain about anything with regard to her initial treatment

of him.  Aside from keeping him in the medical cell, a claim discussed in Section II-B-1 *supra*,

the only other allegation potentially involving Jessee directly is that he alleges he was told by a

"nurse practitioner" that he could not have an MRI done because it would cost too much to

remove the bullet from his rib in order to render an MRI safe.[5]  This is the same allegation he

makes against Bledsoe.

Neither of these incidents reflect deliberate indifference toward his medical needs by

Jessee or Bledsoe.  First of all, there are several references in the medical record stating that the

reason he was denied an MRI not because of cost, but because of the dangers posed by the bullet

lodged in his body.  (Dkt. No. 1-1, at 33, 42.)   And he does not allege that any medical provider

ever suggested or recommended he have surgery to remove the bullet, with its attendant risks,

just so he could have an MRI.

Moreover, the MRI was needed to determine whether Neville should be referred to a

surgeon.  But his chart reflects that someone requested a referral to a surgeon, even in the

absence of an MRI.  Failing to give him this one test, therefore, does not constitute deliberate

---

[5]  He does not allege that he complained to Jessee about his medication not working to resolve his pain, or what was done by her or anyone in response to any such complaints.  It is not always possible to tell who treated him from his Red Onion medical chart, but the chart shows that he complained of pain to nurses at different times and was receiving Tylenol and ibuprofen.  The court did not see any obvious references in the chart to any stronger painkillers.  The court recognizes that continuing to provide ineffective treatment for pain does not insulate a medical provider from an Eighth Amendment claim.  *See, e.g.*, *Perry v. Meade*, 728 F. App'x 180, 182 (4th Cir. 2018) (collecting authority for the proposition that an Eighth Amendment claim can be stated against a medical professional who knowingly ignores complaints of pain and continues with an ineffective course of treatment without exercising professional judgment).  But absent any allegations about when he complained to Jessee about his pain (aside from his complaint about the medical cell) and what she did or failed to do in response, the complaint is insufficient to state a claim.  As noted herein, though, Neville will be given an opportunity to amend his complaint.

indifference.

Similarly, as for his complaints about wanting to be in a different cell so he could better use his walker and not have to stand or sit on the toilet to watch television, that does not show deliberate indifference to his medical needs.  Jessee treated his injury, had him x-rayed, referred him to outside providers for evaluation, and ordered that he be given pain medication, ice, bandages, a walker, and kept in the medical department.  Even if she was the person who declined to move him to a different cell, that one action, particularly considered in conjunction with all the other treatment she provided, does not rise to the level of an Eighth Amendment violation.

Moreover, according to his grievances, it appears that what he is really upset about is that he is not getting the treatment he believes he should, or the "proper" treatment.  But he has been seen and evaluated repeatedly by outside orthopedists, has had numerous tests, has received physical therapy, has been accommodated with (at different times) a walker, a splint, an extra pillow, extra pain medicine, and is being housed in a medical cell where he is observed regularly.  Furthermore, it appears that the only treatment recommended and not yet scheduled (at least as of the date the attached medical records stop—the end of March 2022) is a referral to an outside surgeon.  And Neville does not point to any other treatment that he believes he should have received and has not.  In any event, to the extent that he is arguing they any of his providers should have done something more or different than what they did, that is a difference of opinion as to the proper treatment, which is not a constitutional violation.  *Wright*, 766 F.2d at 849.

As currently pled, therefore, Neville's medical claims must be dismissed against all defendants.  Perhaps, with additional detail, Neville may be able to state an Eighth Amendment claim against Jessee, Bledsoe, or another defendant, but the facts he has alleged in his current complaint are insufficient to do so.  Thus, the court will dismiss his medical claims without

16

prejudice and allow him to file an amended complaint if he believes he can remedy the deficiencies identified by the court.

## III.  CONCLUSION

For the foregoing reasons, Neville's case will be dismissed without prejudice, and he will be given an opportunity to file an amended complaint, if he can correct the deficiencies identified by the court.  An appropriate order will be entered.

Entered: July 12, 2022.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

17